CONRAD, Plaintiff in error, v. STATE, Defendant in error.

*No. State 50.   Argued February 6, 1974.—Decided June 4, 1974.*
(Also reported in 218 N. W. 2d 252.)

618

620

For the plaintiff in error there was a brief by *Robert O. Weisel* and *Cameron, Shervey & Weisel*, all of Rice Lake, and oral argument by *Robert O. Weisel*.

For the defendant in error the cause was argued by *Robert D. Martinson*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HEFFERNAN, J.   Conrad argues on this appeal, as he did at trial and at the hearing on the motion to suppress evidence, that the finding of the body of Marie should be excluded because the body was buried under the rock pile in the "reasonable expectation of privacy." Thus, it is reasoned that the situation in the instant case is one that is afforded the protection of the fourth amendment to the Constitution of the United States and the identical provision of the Wisconsin Constitution.

The reasoning is arguably derived from *Katz v. United States* (1967), 389 U. S. 347, 88 Sup. Ct. 507, 19 L. Ed. 2d 576. The *Katz* rationale was restated in *Terry v. Ohio* (1968), 392 U. S. 1, 9, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889:

"We have recently held that 'the Fourth Amendment protects people, not places,' . . . and wherever an individual may harbor a reasonable 'expectation of privacy,' *id.*, at 361, . . . he is entitled to be free from unreasonable governmental intrusion."

A case decided by this court also relied upon the test of *Katz-Terry*. In *Ball v. State* (1973), 57 Wis. 2d 653, 205

N. W. 2d 353, we held illegal a warrantless search of a garbage can in which loot from a burglary had been placed. We said, "that the trash barrel was within defendant's expectation of privacy and the search of it was unlawful." (P. 664)

In the case before us it cannot be doubted that whoever buried Marie's body under the rock pile did so in the expectation that it would remain hidden. It was buried, *arguendo*, in the reasonable expectation of privacy.

Conrad argues that, if a body is concealed under those circumstances, a search could be undertaken only by warrant after a showing of probable cause.

If Conrad is correct, *i.e.*, that evidence was within the ambit of the Constitution's protection, a warrantless search, except in circumstances not applicable here, is unreasonable per se and the evidence of the body's discovery and the evidence gleaned by exploitation of the original search by the issuance of a subsequent warrant must be suppressed.

The doctrine (the reasonable expectation of privacy) upon which Conrad relies is in contradistinction to the state's reliance upon the "open fields" doctrine which permits a warrantless search under some circumstances.

The "open fields" doctrine was first stated by the United States Supreme Court in *Hester v. United States* (1924), 265 U. S. 57, 59, 44 Sup. Ct. 445, 68 L. Ed. 898. Therein Mr. Justice HOLMES said:

". . . the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

The *Hester Case* originated in a revenue agent's stakeout of the home of Hester's father. Hester was seen from a distance of 50 to 100 yards handing a bottle to a person who was thought to be a customer for bootleg whiskey. Hester took alarm, went to his car, took a jug therefrom,

and ran through the fields. Both the bottle carried by the customer and the jug carried by Hester were thrown into an open field. Both broke, but each contained enough liquid so it could be determined that the liquid was bootleg whiskey. The broken containers were examined by revenue agents where they had been dropped.

The United States Supreme Court held that, even though there was a trespass, the evidence was not obtained by an illegal search or seizure. The court, although pointing out that the whiskey was "abandoned," rested its holding on the fact that the protectional umbrella of the fourth amendment does not cover "open fields."

The reliance of Mr. Justice HOLMES upon Blackstone has been criticized because the cited pages are concerned with the common-law distinction between burglary of a dwelling and a theft from distant out-buildings. Be that as it may, the rule of *Hester* has been accepted as a definitive statement of constitutional law since that date. The fact that its precedential underpinnings are questionable in no way vitiates the clarity of the rule expressed therein, nor does it weaken the court's declaration of the appropriate standard to be applied in gleaning evidence from the examination of open fields.

Unless *Hester* has been altered by the United States Supreme Court, or by this court, which can give even a greater constitutional protection than the United States Supreme Court would insist upon, *Hester* remains authoritative.

Under *Hester*, even though the sheriff in this case committed an outrageous trespass, the evidence of the corpse was admissible although the body was buried in the soil under a rock pile. The "open fields" doctrine is predicated on the theory that the protection of the fourth amendment is to "persons, houses, papers, and effects." Under that theory, the fourth amendment affords no protection to evidence either on or in the ground, unless

the particular area in question is so intimately related to a protected area that it can come within the concept of curtilage.

Under the "open fields" doctrine, the fact that evidence is concealed or hidden is immaterial. The area is simply not within the protection of the fourth amendment. If the field where the body was found does not have constitutional protection, the fact that the sheriff, rather than observing the evidence that might have been in plain view, dug into the earth to find the body and committed a trespass in so doing does not confer protection.

In *United States v. Brown* (5th Cir. 1973), 473 Fed. 2d 952, the "open fields" doctrine was applied to admit evidence that the F. B. I. obtained only by digging under a chicken coop in an open field.

In *Care v. United States* (10th Cir. 1956), 231 Fed. 2d 22, certiorari denied, 351 U. S. 932, 76 Sup. Ct. 788, 100 L. Ed. 1461, the "open fields" doctrine was applied to permit the introduction of evidence relating to the discovery of a still which was concealed in a cave about 125 yards from the house. The holding emphasized that it was the curtilage that was protected, that the protection of the fourth amendment against unreasonable search and seizure does not apply to an open field.

"Whether the place searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family."

Inferentially, the defendant concedes that if the "open fields" doctrine remains an acceptable rule of law, the search and seizure did not violate the constitution and the evidence was properly admitted.

Defendant urges that *Katz v. United States, supra,* sounded the death knell of the "open fields" doctrine, and

overruled, *sub silentio, Hester.* We do not see that such a broad sweep can be given to the language of *Katz.* *Katz* involved the eavesdropping on a telephone conversation—a wire tap on a phone booth that was apparently an isolated structure. In that case, the government argued that there was no violation of a constitutional right because there was *no physical intrusion* of any device into the booth. This argument was rejected on the reasoning of *Silverman v. United States* (1961), 365 U. S. 505, 81 Sup. Ct. 679, 5 L. Ed. 2d 734, that a technical trespass under property law was irrelevant to the question of fourth amendment protection—a position that was also stated in *Hester, supra.* In *Katz,* however, the trespass doctrine was definitively rejected. The court held that:

"The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which *he* justifiably relied while using the telephone booth and this constituted a 'search and seizure' within the meaning of the Fourth Amendment." (Emphasis supplied.) (P. 353)

What *Katz* emphasized is the right of a person—the caller from the phone booth—to be secure from an unreasonable search and seizure, the interception of his conversation. *Katz* spells out the not very novel idea that a person, clearly protected by the constitution, is afforded the protection of the constitution wherever he may be, and that protection is afforded even if there is no technical trespass in a common-law property sense. Once it was conceded, as the majority of the United States Supreme Court has, Mr. Justice BLACK notwithstanding, that a verbal communication is a "thing" subject to seizure, the *Katz* ruling was inevitable. Where the person was when he uttered the "seized" statement is irrelevant and the person's utterance is protected. True, as *Katz* makes clear, he could waive the right by evincing an election not to keep his utterances private—an election clearly not made when calling from a closed telephone booth. Hence the language:

". . . the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, page 351.

The importance of *Katz* is not that it spreads the umbrella of the fourth amendment to a telephone booth, but that it foretold the possibility that, even in a place traditionally thought to be an area protected by the fourth amendment, protection would not be afforded in the absence of a subjective intent to exercise a reasonable expectation of privacy. The concept of a protected area remains. A home is such an area, and so is the curtilage surrounding a home; but as noted in *Katz* (fn. 9, p. 351), the United States Supreme Court has "never suggested that this concept can serve as a talismanic solution to every Fourth Amendment problem."

The concurring opinion of Mr. Justice HARLAN interpreted the majority in *Katz* (p. 361) as merely holding that a telephone booth was "a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." Mr. Justice HARLAN contrasts the telephone-booth situation with a conversation in the open where there would be no expectation of privacy. For this proposition he relied upon and cited *Hester, supra,* whose holding was not challenged in the majority opinion. The majority simply distinguished the situation in *Katz* from that of *Hester* and found, in effect, that the "open fields" doctrine was not factually applicable. The viability of *Hester* was not weakened by the holding of *Katz*.

In 1968, the United States Supreme Court decided *Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889, and referring to the language of Mr. Justice HARLAN, concurring in *Katz,* stated:

"We have recently held that 'the Fourth Amendment protects people, not places' . . . and wherever an individual may harbor a reasonable 'expectation of privacy'

. . . he is entitled to be free from unreasonable governmental intrusion. . . . Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland." (P. 9)

It was not *Katz*, however, that mandated that conclusion. That was old and accepted law. Among the six cases cited for that proposition was *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543, a case decided more than twenty years earlier.

*Terry* also stands for the proposition that: Where a person is, there also is the protection of the fourth amendment. That consideration is totally irrelevant to the question of whether a subjectively displayed desire to conceal evidence in an open field casts about the concealment the constitutional shield of the fourth amendment.

Neither *Katz* nor *Terry* overrule *Hester*. The statement that the fourth amendment protects persons and not places reinforces the position of Mr. Justice HOLMES in *Hester* that a place is not per se protected against an unreasonable search and seizure. An open field remains beyond the ambit of the fourth amendment's protection. A search may be made there without a warrant and without probable cause, and that which is found will not be suppressed by the courts.

It is noteworthy that Mr. Justice WHITE, who differed with the majority in *Katz* only to the extent that he would permit wiretapping by the president or the attorney general in national security cases, and agreed with the *Katz* rationale, cited *Hester* in his concurrence to *Coolidge v. New Hampshire* (1971), 403 U. S. 443, 513, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564, almost four years after counsel argues that its doctrine was put to rest by *Katz*.

In *Cady v. Dombrowski* (1973), 413 U. S. 433, 450, 93 Sup. Ct. 2523, 37 L. Ed. 2d 706, the United States Supreme Court referred to *Hester* as a viable authority to validate an open field search.

It is clear, therefore, that *Hester* lives, and allows a search without a warrant, even though, as in the instant case, there was a trespass.

What then is the effect of *Katz* if not to replace the "open fields" doctrine of *Hester?* As applied by other courts, it appears to be a modification of the curtilage rule. This is illustrated by *Wattenburg v. United States* (1968), 388 Fed. 2d 853, a post-*Katz* case.

In *Wattenburg*, Christmas trees, some of which were allegedly cut on a government forest preserve, were stacked with other cut trees *"immediately adjacent"* to the lodge where the defendant Wattenburg lived. A search was made without a valid warrant. The government argued that the search was free of the restraints of the fourth amendment because it took place in an "open field." The court acknowledged the "open field" rule of *Hester* and stated:

". . . the 'open field' doctrine has been uniformly recognized and applied where, *under the facts of a particular case,* it was held that the search and seizure had occurred in an open field." (Emphasis supplied.) (P. 856)

The court went on to quote with approval the application of the *Hester* doctrine in *Care, supra,* and other Federal cases where the searches were conducted at distances of 100 feet to a half a mile from the residence. Those situations the court contrasted to the facts before it, where the trees were "immediately adjacent" to the dwelling.

It held that the search took place within the curtilage as defined, *supra,* in *Care, supra.* The court held that, as a search within the curtilage, it was illegal in the absence of a warrant based on probable cause. This was the holding of *Wattenburg.* As dicta, in the opinion of this writer useful and instructive dicta, the court in *Wattenburg* added that a more appropriate test was:

"[W]hether [the search] constitutes an intrusion upon what the resident seeks to preserve as private even in an area . . . *adjacent to his home,* is accessible to the public." (Emphasis supplied.) (P. 857)

On this test also the search of the *curtilage* was held to be a violation of the fourth amendment.

Hence, it appears that the rule of *Katz,* as explained by *Wattenburg,* is an explication or modification based on present-day concepts of the ancient curtilage test. It is also a limitation of it. Under the strict curtilage test, the subjective element of a reasonable expectation of privacy was omitted. There was, in effect, a legal presumption that all within the curtilage was protected.

The principle was well stated by William Pitt when speaking in the House of Commons in 1763 on the Cyder Tax. While asserting that every man's house is his castle, he said:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter—the rain may enter—but the King of England cannot enter!—all his force dares not cross the threshold of the ruined tenement!" (Quoted in McNamara, *2,000 Famous Legal Quotations,* p. 515)

Under the subjective test, it now appears that one who places "papers and effects" within the curtilage in an area open to the public will not be protected against a search and seizure unless the circumstances spell out a subjective and reasonable expectation of privacy despite the semipublic nature of the area within the curtilage.

Despite the language of *Katz* that heroically asserts that the fourth amendment "protects people, not places," the fact is that the *Katz* rule as interpreted in *Wattenburg* and as it must, apparently, be applied in the future, gives less protection to the person than the earlier rule. It represents an encroachment upon the umbrella of protection that heretofore was afforded to "papers and

effects" within the curtilage. It shifts the burden of proof to the accused, who must now show, inferentially at least, a subjective and reasonable expectation of privacy if the curtilage is accessible to the public. Heretofore, the government, if it wished to search the curtilage, was obliged to rely on "plain view" or waiver doctrine, doctrines on which it had the burden of proof.

*Katz* and *Wattenburg* represent limitation of the scope of the constitutional protection of the individual. *Katz* makes sense, to the degree that, where a person is, there is his castle, to be protected from governmental intrusion. It was clear in *Katz* that the person making the phone call had momentarily at least elected, under circumstances where it was reasonable to so elect, to make the phone booth a place of privacy for *his* person and his conversations. It was a place where the "King of England cannot enter" either by a trespass or by a surreptitious or physically intrusive electronic bug.

*Katz*, if applied in all cases in the manner urged by the defendant in this case, does not further personal liberty; it constrains it. Only if *Wattenburg* and its progeny are interpreted to be a restriction on the "plain view" doctrine can it be arguably asserted that greater protection is offered. Under *Wattenburg,* it is conceivable that what is in "plain view" will nonetheless be protected because it was placed there with a reasonable expectation of privacy. On the other hand, the *Wattenburg* test is a subjective one, and the placing of a "thing" where it will be revealed by a plain view is evidence that there was no expectation of privacy.

The clear import of a series of California cases discussing *Katz* is the same. *People v. Edwards* (1969), 71 Cal. 2d 1096, 80 Cal. Rptr. 633, 458 Pac. 2d 713, involved the warrantless search of trash cans located *two or three feet from the back porch* of the defendant. It was held that the cans were constitutionally protected because

there was a reasonable expectation of privacy and the marijuana "was not visible [no plain view] without 'rummaging' in the receptacle." (P. 1104) *Edwards* cited *Hester* and distinguished it on the fact that in *Hester* the whiskey was at a distance from the dwelling.

In *People v. Bradley* (1969), 1 Cal. 3d 80, 81 Cal. Rptr. 457, 460 Pac. 2d 129, the California Supreme Court upheld a warrantless search and seizure of marijuana plants in the defendant's backyard. There again the court cited with approval the *Hester* "open fields" doctrine, and criticized not the doctrine but only its occasional misapplication, saying it "does not afford a solution to every case involving a claim of an illegal search and seizure." (P. 84)

The California court in *Bradley* found that the "open field" test was not appropriate to the *facts* before it. It pointed out that the marijuana plants were within 20 feet of the defendant's back door, where they could be seen by tradesmen and delivery persons. They were not covered by an opaque material and "at least part of the plants were in plain sight" (P. 85) of anyone who approached. The situation was (by a citation to *Hester*) specifically contrasted to the "open fields" doctrine set forth herein.

Mr. Justice TOBRINER dissented on the factual basis that there was not a "plain view" unless the viewer approached to within one foot of the marijuana plants, and, hence, the householder was protected by a reasonable expectation of privacy within his enclosed yard. Mr. Justice TOBRINER pointed out, that this case dealt not with "open fields," but with "the yard adjacent to a private residence." Only if the plants were in plain view of a person in the public area of the curtilage did he feel the seizure would have been justified.

A recent case of this court, *Ball v. State* (1973), 57 Wis. 2d 653, 660, 205 N. W. 2d 353, pointed out the

viability of the rule of *Hester*. It highlighted the limited scope of *Katz* and its progeny. The "expectation of privacy" test was pointed out to be pertinent only in determining "whether a search and seizure *adjacent* to a house is constitutionally protected." (Emphasis supplied.) (P. 661) It recognized the protection of the fourth amendment afforded to the area adjacent to the house where the placing of allegedly stolen articles in a garbage can just to the rear of the house demonstrated the defendant's reasonable expectation of privacy, and contrasted the facts to instances where objects were in "public view." (P. 662)

A per curiam opinion of this court, *Watkins v. State* (1973), 59 Wis. 2d 514, 208 N. W. 2d 449, held that an officer could conduct a search of a common storage room of an apartment house (clearly within the curtilage) without violating the defendant's fourth amendment rights. This court said that in such common room accessible to all the defendant "could harbor no expectation of privacy." (P. 514) Again *Watkins* demonstrates that the extension of the *Katz* rule permits inroads upon the protection of the curtilage unless there is a subjective demonstration of a reasonable expectation of privacy.

The law in Wisconsin in respect to "open field" searches in areas away from the curtilage remains unchanged. No warrant is required for a search, and police officers may search such areas above or below the ground undeterred by the fourth amendment.[1]

---

[1] While no protection is afforded by the fourth amendment, an intrusion such as was made in the instant case would constitute a trespass punishable by law. Certainly such random digging of another's property as performed by Sheriff Anderson should not be approved, but the disapproval of a trespass and sanctions for it must come from other aspects of the fourth amendment than the exclusionary rule. *See Bivens v. Six Unknown Federal Narcotics Agents* (1971), 403 U. S. 388, 91 Sup. Ct. 1999, 29 L. Ed. 2d 619, for a discussion of other remedies.

In respect to the curtilage, the law has been changed by *Katz* except where a waiver of the right of privacy has been demonstrated. Where there is demonstrated a reasonable expectation of privacy, there can be no search in the curtilage except upon warrant issued upon probable cause. Hence, had the body been revealed by the search immediately adjacent to the house—in the excavation under the dog pens—the evidence of the body would have to be suppressed. Only were the evidence in plain sight within the curtilage or were there some subjective showing of waiver would the necessity for a warrant be obviated. To that extent, the protection of the fourth amendment in respect to searches within the curtilage has been reduced.

We hold, therefore, that the evidence of the finding of the body of Marie Conrad in the open fields approximately 450 feet from the house was properly admitted into evidence.

This protracted discussion of hair-splitting distinctions demonstrates the truth of Mr. Justice REHNQUIST's statement in *Dombrowski, supra,* p. 440, that "this branch of the law is something less than a seamless web." The United States Supreme Court has made the law of search and seizure almost as incomprehensible as the law of obscenity. The decisions of the supreme court, of the lower federal courts, and of this court have made possible a deluge of legal legerdemain which may be exercised whenever a court either wishes to sustain a search or to reject it.

There is a theory to fit almost any preference. Rules of reasonableness can be tailored to fit almost every variation of reasoning.

The rule that requires that illegally seized evidence be excluded has, by virtue of the labyrinthine qualifications and exceptions, itself become suspect, not because it does not possess merit, but because its efficacy is doubtful.

The rationale of the exclusionary rule is twofold:

"[1] . . . to deter unlawful or undesirable or unconstitutional police conduct, and [2] to insure some integrity in the judicial process by not having the judicial process sanction, approve and be party to constitutional violations or undesirable or unlawful police conduct in allowing evidence to be used notwithstanding the manner in which it was seized." Santarelli, 61 Fed. Rules Decisions 273 (March, 1974).

Only if a prosecution is commenced, however, and a case brought to court is it even possible to invoke the judicial sanction of the exclusionary rule, and then only to the benefit of those who would arguably be found guilty were the evidence admitted.

The sanction cannot apply if the person who is the subject of an illegal search is either deemed innocent, because no evidence is found, or if, as a matter of police policy, the decision is not to prosecute. An "undesirable" person who is hassled by searches and seizures that are calculated for the purpose of "leaning on" or harassing him is afforded no protection by the exclusionary rule. Police misconduct is not prevented. Police hassling can continue unaffected by the strictures of the fourth amendment. A guiltless person who is the subject of a grossly intrusive and illegal search can be afforded no relief by the exclusionary rule.

Thus, the penalty that is assessed by the invocation of the exclusionary rule is not an assurance that there will be no police misconduct, it is merely an assurance that society will be penalized by its inability to use relevant evidence to punish crimes committed against society and the state.

Courts and judges should not sanction violations of the constitution. The integrity of the judicial process must be inviolate and free from reliance upon transgressions against the constitution which every judge has taken the

oath to uphold, but is this good purpose enhanced by the exclusionary rule?

While it is clear that the constitution by the fifth amendment forbids the use of self-incriminating evidence, and does so in specific terms, no such sanction is mandated upon the courts by the fourth amendment. The exclusionary rule is a judge-made one in furtherance of conduct that courts have considered to be in the public interest and to suppress conduct that is not. Certainly the integrity of trial courts as searchers for the truth is seriously compromised if they are required by appellate court rules having their genesis, not in the constitution, but in the grant of superintending powers to suppress relevant evidence of guilt and permit the guilty to escape the rehabilitative or punitive aspects of our criminal law—unless there is the clear assurance that the exclusionary rule is accomplishing its purpose to prevent future transgressions of the fourth amendment and to impose discipline for past offenses.

In the instant case had the search by Sheriff Anderson revealed no corpse, a prosecution would not have been brought. Assuming *arguendo* that the victim of the sheriff's "hunch" is innocent, he would find his outbuildings knocked over, holes dug at random near his home and in his fields, and the marks of heavy machinery on his land, but since no prosecution had been brought, he would be remediless.

In the instant case we conclude that the search was not impermissible under the fourth amendment. Yet a wrong, a clear trespass, was committed, but no remedy of any value has been established by the courts to right this wrong. We need shed no tears over the plight of the defendant in this case, but our preoccupation with the exclusion of illegally obtained evidence that is highly probative of guilt has blinded courts and legislatures to wrongs that may be done those who are clearly innocent. The exclusionary rule does not protect their privacy. Its

purpose, though noble, is simply not effectuated when it can only be made to apply against society for the benefit of the arguably guilty.[2]

To question the exclusionary rule is, however, to open a Pandora's box of substitutes. Those who are likely to be hassled by police conduct are the persons least likely to resort to the courts for redress of grievances. To enforce any control over police conduct, absent the exclusionary rule, may require extensive and undesirable administrative controls over police conduct and that of an elected public officer. To prevent police incursions against private rights, the establishment of administrative tribunals either within or without the law enforcement structures have been suggested. Criminal penalties against police officers who conduct illegal searches is another proposed alternative.

To conclude as this court does that the exclusionary rule is a weak reed indeed to enforce the fourth amendment is not to suggest a specific replacement for it. At this stage of our legal history when the exclusionary rule has been given statutory sanctions, its repeal or change is an obligation of the legislature. In addition, of course, the rule is mandated upon all states by *Mapp v. Ohio* (1961), 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. 2d 1081. Accordingly, this court is not now free to overrule *Hoyer v. State* (1923), 180 Wis. 407, 415, 193 N. W.

---

[2] The concurring opinion misunderstands the majority's concern about the exclusionary rule.

The problem is that the application of the exclusionary rule fails to assure the protection against unlawful search and seizure that is the promise of the fourth amendment.

The real world is not the world of the courtroom alone. The rights of innocent people to privacy are not protected by judicial exclusion of inculpatory evidence when there is no such evidence and no prosecution is brought. Yet violations of privacy may continue unchecked by the exclusionary rule, which can only be a sanction against the state in a prosecution against the arguably guilty. The instant case highlights the impotency of the exclusionary rule to prevent illegal trespasses and invasions of privacy.

89. It is clear, however, that the price paid by society by the invocation of a fourth amendment exclusionary rule is high indeed. If the rule prevented illegal searches, or even clearly tended to discourage them, there would be a substantial justification for the rule, but there is no evidence that society receives this *quid pro quo* for the dismissal of charges against the guilty.

Dean Wigmore foresaw in 1922 (*Using Evidence Obtained by Illegal Search and Seizure,* 8 A. B. A. Journal 479) the path down which the exclusionary rule of *Boyd v. United States* (1886), 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, and *Weeks v. United States* (1914), 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, would lead us. He said (P. 484):

"The doctrine of Weeks v. United States also exemplifies a trait of our Anglo-American judiciary peculiar to the mechanical and unnatural type of justice. The natural way to do justice here would be to enforce the splendid and healthy principle of the Fourth Amendment directly, *i. e.,* by sending for the high-handed, over-zealous marshal who had searched without a warrant, imposing a thirty-day imprisonment for his contempt of the Constitution, and then proceeding to affirm the sentence of the convicted criminal. But the proposed indirect and unnatural method is as follows:

" 'Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the constitution. Titus ought to suffer imprisonment for crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else.' "

"Some day, no doubt, we shall emerge from this quaint method of enforcing the law. At present, we see it in many quarters. It will be abandoned only as the judiciary

rises into a more appropriate conception of its powers, and a less mechanical idea of justice."

The effect of the exclusionary rule in practice was succinctly stated by Cardozo in *People v. Defore* (1926), 242 N. Y. 13, 21, 150 N. E. 585, "The criminal is to go free because the constable has blundered." Ought that be the remedy?

Once it is concluded as we do that the evidence of the discovery of Marie Conrad's body was properly before the jury, the question remains, was the evidence sufficient to sustain the jury's verdict of murder in the first degree? The defendant's brief concedes circumstantial evidence of the defendant's guilt and disputes only the body-discovery evidence.

The record reveals a history of marital discord and violent altercations. There was evidence of an incipient affair with Carol Wallace. Conrad was the last to see Marie alive, and his discrepant accounts of her departure and her whereabouts lead to the inference that he was attempting to dissemble. Marie met her death as the result of being shot with a high-powered hunting rifle, a kind of rifle that Conrad was known to possess. Under this state of evidence, the jury could conclude that Conrad had intentionally killed his wife Marie.

Defendant argues, however, and it is almost his only argument, that the facts demonstrate that he could not have placed Marie's body under the rock pile because when he left Wisconsin on August 7, 1972, there were two rock piles on the farm and when the body was discovered the rock piles had been consolidated into one pile over Marie's grave. There was evidence that on August 19th a deputy sheriff saw two separate rock piles on the property. The assumption made by the defendant is that whoever incorporated the rocks into one pile committed the murder and buried the body. Thus, according to the theory of Conrad, the body was placed

under the rock pile after August 19th, only two months before its discovery. In contrast to this theory, Dr. Olson, the coroner, testified that the body had been in the grave for a minimum of three months and a maximum of six months. This testimony was not disputed and the jury was entitled to believe it. The jury could conclude that the body had been in the earth at least by July 26th and perhaps earlier. It is undisputed that Conrad was on the farm at that time. Under this view of the evidence, which the jury was entitled to believe, whether there was one rock pile or two was immaterial. The evidence was sufficient to sustain the verdict.

*By the Court.*—Judgment and order affirmed.

WILKIE, J. *(concurring)*. I agree that the evidence of the finding of the body of Marie Conrad was properly admitted. However, I disagree with the majority's dicta criticizing the exclusionary rule.

In essence, the exclusionary rule is one of the manifestations demonstrating the degree of civilization we have achieved in developing our democratic society. Ours is a government of laws, not of men, it is often said, and in the exclusionary rule we have a positive demonstration of our willingness that the government will not profit while it breaks the law and thus breeds contempt for the law. Mr. Justice BRANDEIS said in his dissent in *Olmstead v. United States:*

". . . In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." [1]

As recently as five years ago, Mr. Chief Justice WARREN, speaking for the court in *Terry v. Ohio* [2] said:

[1] (1928), 277 U. S. 438, 485, 48 Sup. Ct. 564, 72 L. Ed. 944.
[2] (1968), 392 U. S. 1, 12, 13, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889.

". . . The rule also serves another vital function—'the imperative of judicial integrity.' *Elkins v. United States,* 364 U. S. 206, 222 (1960). Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."

The essential justification for the exclusionary rule, which was fashioned by the United States Supreme Court as early as 1886 in *Boyd v. United States,*[3] and more fully in 1914 in *Weeks v. United States*[4] was very recently stated by three dissenting justices in the case of *United States v. Calandra,*[5] wherein a majority of the United States Supreme Court held that the exclusionary rule in search and seizure cases does not apply to grand jury proceedings. The dissenting justices, vigorously defending the exclusionary rule, observed:

". . . The exclusionary rule, if not perfect, accomplished the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government."[6]

Our Wisconsin Supreme Court adopted the exclusionary rule with respect to Wisconsin criminal proceedings in 1923 in *Hoyer v. State.*[7] In *Hoyer* the court, in discussing art. I, sec. 11, of the Wisconsin Constitution—the constitutional identical counterpart of the United States Constitution's fourth amendment—stated:

"Sec. 11, art. I, Wis. Const., *supra,* is a pledge of the faith of the state government that the people of the state,

---

[3] (1886), 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746.

[4] (1914), 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652.

[5] (1974), 414 U. S. 338, 94 Sup. Ct. 613, 38 L. Ed. 2d 561.

[6] *Id.* at page 357.

[7] (1923), 180 Wis. 407, 417, 193 N. W. 89.

all alike (with no express or possible mental reservation that it is for the good and innocent only), shall be *secure* in their persons, houses, papers, and effects against unreasonable search and seizure. This security has vanished and the pledge is violated by the state that guarantees it when officers of the state, acting under color of state-given authority, search and seize unlawfully. The pledge of this provision and that of sec. 8 [Prosecutions; second jeopardy; self-incrimination; bail; habeas corpus.] are each violated when use is made of such evidence in one of its own courts by other of its officers. That a proper result—that is, a conviction of one really guilty of an offense—may be thus reached is neither an excuse for nor a condonation of the use by the state of that which is so the result of its own violation of its own fundamental charter. . . ."

Law enforcement personnel of the federal government and here in Wisconsin have operated under the exclusionary rule for over half a century. There has been no collapse of either the federal or Wisconsin local law enforcement machinery. The majority admits that there is difficulty with all the known alternatives to the exclusionary rule. Although there are difficulties in operating under that rule, the exclusionary rule is not only required by our Wisconsin case of *Hoyer* [8] and in fact as the majority states "has been given statutory sanctions," [9] but is also mandated by *Mapp v. Ohio.* [10]

A recent commentator, discussing the exclusionary rule, said:

". . . If constitutional rights are to be anything more than pious pronouncements, then some measurable consequence must be attached to their violation. It would be intolerable if the guarantee against unreasonable search and seizure could be violated without practical consequence. It is likewise imperative to have a practical procedure by which courts can review alleged violations of constitutional rights and articulate the meaning of

[8] *Supra,* footnote 7.
[9] *E.g.,* sec. 971.31 (2), Stats.
[10] (1961), 367 U. S. 643, 81 Sup. Ct. 1684, 6 L. Ed. 2d 1081.

those rights. The advantage of the exclusionary rule—entirely apart from any direct deterrent effect—is that it provides an occasion for judicial review, and it gives credibility to the constitutional guarantees. By demonstrating that society will attach serious consequences to the violation of constitutional rights, the exclusionary rule invokes and magnifies the moral and educative force of the law. Over the long term this may integrate some fourth amendment ideals into the value system or norms of behavior of law enforcement agencies." [11]

I am authorized to state that Mr. Chief Justice E. HAROLD HALLOWS joins in that part of the concurrence which disagrees with the dicta criticizing the exclusionary rule.

HALLOWS, C. J. *(dissenting)*. I think the search was illegal. The location on the defendant's farm was protected and was not an "open field" within the meaning of that doctrine. I cannot accept the proposition that a sheriff on suspicion can dig up a person's property with a backhoe or bulldozer, looking for evidence of crime. The majority opinion, while disapproving of what the sheriff did, apparently considers it was a reasonable search under the constitution. I also disagree with the dicta criticizing the exclusionary rule and in this respect agree with the concurring opinion of Mr. Justice WILKIE.

[11] Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. Chi. L. Rev. (1970), 665, 756.