¶ 72.
REBECCA GRASSL BRADLEY, J.
{concurring). I agree with the majority opinion's analysis supporting Stietz's entitlement to the self-defense jury instruction and join the opinion. I write separately because the circuit court also erred when it refused to allow Stietz to present a defense based on evidence that the DNR wardens were trespassers on private property, and I disagree with the majority's assertion that "[w]e need not" address this issue. Majority op., ¶ 4 n.5. I also write to reaffirm that the Fourth Amendment prohibits the government from seizing a person on private property—including open fields— absent consent, a warrant, probable cause and exigent circumstances, or another lawful basis for interfering with a person's right to be free from governmental intrusion.
*598 H
¶ 73. The Sixth Amendment guarantees a criminal defendant the right to present a defense. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973).[1] "[A] fundamental element of due process of law," the right to present a defense includes "the right to present the defendant's version of the facts ... to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967); see also State v. Dodson, 219 Wis. 2d 65, ¶¶ 35-36, 580 N.W.2d 181 (1998). "Whether an evidentiary ruling infringes upon a criminal defendant's right to present a defense is a question of constitutional fact for independent review." State v. Ward, 2011 WI App 151, ¶ 15, 337 Wis. 2d 655, 807 N.W.2d 23 (quoted source omitted). The majority opinion sets forth the proper standard of review as to whether the circuit court erred when it refused to give the requested jury instructions, and therefore I will not repeat it here. See majority op., ¶[¶ 12-14 & n.10. Stietz wanted to testify he thought the DNR wardens were trespassers, and sought to make that argument to the jury, but the circuit court limited his testimony on trespassing,[2] refused to allow his attorney's argument, and denied his request for the jury to be in *599 structed on the law of trespass. The circuit court erred. These errors, together with the self-defense error, violated Stietz's constitutional right to present a defense.
¶ 74. A brief examination of the facts puts the trespass issue into context. Stietz had problems with trespassers in the past and lodged numerous trespassing complaints with the local sheriffs department. One trespasser broke windows on a trailer Stietz kept on the land. At the time Stietz encountered the wardens, he was checking for trespassers on his private, fenced land marked by conspicuous "no trespassing" signs; he was also inspecting the integrity of his fence because he intended to pasture a longhorn cow there the following day. The sun had set and it was fairly dark as 64-year-old Stietz walked his property—alone. He had not invited anyone onto his private property and was not expecting any visitors. This property, located approximately half a mile from the public road, was surrounded by other private property, part of which belonged to Stietz's uncle. There was no formal or permanent walkway or driveway inviting visitors onto the private land.
f 75. DNR Wardens Frost and Weber entered Stietz's private land shortly after hunting hours ended on November 25, 2012, while en route to a citizen complaint in another county. While driving along the public road adjacent to privately-owned property, the wardens saw a small sedan parked on the grassy area of private property, about a quarter mile from the road. The wardens decided to circle the area, which included Stietz's private property, to check for hunters who might be hunting after hours. During this trip, the wardens listened for any audible sound and used binoculars and a scope to scour the land for hunters. *600 They heard nothing and saw no one. Nevertheless, the wardens decided to drive onto the private property to investigate the legally parked car. There was no formal driveway, but a portion of the grassy field suggested a "field lane," which they used to reach the car. Warden Webster ran the registration on the car, which belonged to Robert and Sue Stietz, the adjacent property owners. Warden Frost got out and looked into the car's windows. He saw an empty rifle case, some buck lure, and a tree seat. The wardens decided to proceed further onto the private property to look for illegal hunters. No attempt was made to contact the owners of the private land, there was no evidence of dead or diseased wild animals on the land, there was no audible noise suggesting illegal hunting or suspicious activity, and there was no evidence that a crime had been or was about to be committed.
¶ 76. While checking the fence, Stietz saw two strangers clad in orange about 20 to 30 yards away, walking on his property. When the two men approached Stietz, they turned a flashlight toward him and asked him to give them his rifle. Stietz—an armed services veteran, a citizen with no criminal record, and a hunter without violations in the past 50 years— refused to turn his weapon over to two men he did not know who appeared uninvited on his private land. At that point, Warden Webster physically grabbed Stietz, and the two wardens forcibly wrested the shotgun away from him.[3] After the seizure, all three men drew *601 their handguns, resulting in the standoff that formed the basis for the charges in this case.
¶ 77. Stietz, who testified on his own behalf, wanted to tell the jurors that he believed the two men were trespassers, and the circuit court erred in barring this part of Stietz's testimony. "All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court." Wis. Stat. § 904.02. A defendant has a fundamental right to testify and give, in his own words, his version of what happened. See State v. Nelson, 2014 WI 70, ¶ 19, 355 Wis. 2d 722, 849 N.W.2d 317. Stietz's testimony giving his version of events was relevant and should have been admitted. Excluding the trespass testimony prevented Stietz from fully presenting his defense.
¶ 78. Stietz's attorney also sought to argue the wardens were in fact trespassers, and requested a trespass jury instruction, but the circuit court refused both requests. It concluded the wardens were not trespassing. The law, however, does not support the circuit court's decisions and instead confirms Stietz's argument that the wardens were trespassing.
¶ 79. Wisconsin Stat. § 943.13 prohibits any person from entering the land of another without express or implied consent of the owner or occupant. The wardens did not have consent from Stietz or his uncle. Wisconsin Stat. § 29.924(5) allows DNR wardens to enter private lands for the purpose of "retrieving] or diagnosing] dead or diseased wild animals and taking] actions reasonably necessary to prevent the spread of contagious disease in the wild animals," and wardens may enter the property only "after making reasonable efforts to notify the owner or occupant." *602 The wardens made no effort at all to notify Stietz or his uncle before entering the private land, and there were no dead or diseased wild animals in need of retrieval or diagnosis.
¶ 80. Wisconsin Stat. § 23.58(1), which authorizes DNR wardens to conduct a Terry[4] stop, provides that "an enforcing officer," "having identified himself or herself as an enforcing officer," "may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a violation" of any applicable laws or rules. (Emphasis added.) The wardens here were not in a public place and, even if Terry permitted investigatory stops on private property, the wardens did not have reasonable suspicion that Stietz was breaking the law when they drove onto private property to investigate. Reasonable suspicion exists when a law enforcement officer possesses "specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." State v. Young, 2006 WI 98, ¶ 21, 294 Wis. 2d 1, 717 N.W.2d 729. The DNR equivalent would require a reasonable belief that a hunting violation is afoot. A car legally parked on private property does not, alone, create reasonable suspicion of a hunting violation. A mere "hunch" that the car means someone is hunting illegally is also insufficient. See id.
¶ 81. Wisconsin Stat. § 23.59 authorizes a search for weapons during a § 23.58 Terry stop if there is a reasonable suspicion of danger to the warden or another person. But, once again, these statutes apply only to a stop in a public place, not a stop on private property. Wisconsin's codification of the Terry stop in *603 Wis. Stat. § 968.24 also specifies that a stop under this statute must occur in a public place. See State v. Stout, 2002 WI App 41, ¶ 15, 250 Wis. 2d 768, 641 N.W.2d 474 (holding that police may confront citizens only in public places; private places require a warrant or "probable cause and exigent circumstances or consent"). Stietz's 25-acre parcel of fenced and posted land was not a public place.
¶ 82. At oral argument in this case, the State could not identify any law authorizing the wardens to be on Stietz's land. There is none. The State asserted only that the "open fields" doctrine justified the wardens' intrusion on private property, reasoning that the doctrine made Stietz's secluded, remote land a "public place" on which the wardens were privileged to traverse. The State is wrong. The open fields doctrine does not transform private fields into public places that anyone is free to enter uninvited or without reason. Nor does it convert the act of trespassing into a lawful intrusion. See Oliver v. United States, 466 U.S. 170, 183 (1984) ("The law of trespass . . . forbids intrusions upon land that the Fourth Amendment would not proscribe.") Rather, the open fields doctrine only prevents suppression of evidence gathered by law enforcement officers who enter an open field without a warrant. The open fields doctrine does not sanction the seizure of a person, nor does it create the requisite constitutional basis for seizing a person acting lawfully simply because the person is standing in an open field. Significantly, the open fields cases arose after law enforcement officers observed evidence of suspected illegal activity conducted upon the land either directly or indirectly, through an informant or tipster. See id. at 173-77 (police investigating a tip of marijuana farm saw illegal plants in field; suppression not required); *604 Hester v. United States, 265 U.S. 57, 57 (1924) (police investigating a tip of illegal activity chased suspects who ran when police arrived; suppression of evidence tossed in open field not required); State v. Martwick, 2000 WI 5, ¶¶ 9, 10, 12, 32, 37, 43, 231 Wis. 2d 801, 604 N.W.2d 552 (evidence admissible where informant reports marijuana plants, police see plants in open area beyond curtilage that is not fenced in or posted "no trespassing," police take a leaf to test, and police later obtain warrant).
¶ 83. The DNR wardens did not receive a tip or make a direct observation that Stietz was engaged in illegal activity on his property. When the wardens observed the property before entering, they saw no evidence of illegal activity. Warden Frost testified that they drove completely around the area surrounding Stietz's private property and used binoculars to look for hunters, but they "didn't see any evidence that anybody was out in the field at the time." Importantly, Stietz is not seeking to suppress evidence taken from his property to be used against him in a criminal prosecution. The open fields exception to the Fourth Amendment's warrant requirement was not intended to eliminate property owners' rights by sanctioning entry onto open land at any time for any reason, or no reason at all.[5]
*605 ¶ 84. The State's bald assertion in its brief that "wardens do not need reasonable suspicion to believe that a crime has been committed before they enter private land" is erroneous. The State has not cited and I cannot locate any authority permitting DNR wardens to traverse privately owned lands without any legal justification. As already noted, the reasonable suspicion standard applies to public places, not an individual's remote, secluded, fenced, and posted private land. Even if we applied the reasonable suspicion standard to private land, the only information the DNR wardens possessed before intruding onto private property was a legally parked car. This falls far short of satisfying the reasonable suspicion standard.
¶ 85. The State also asserts that Stietz lacks standing to invoke trespass as a defense because the physical confrontation with the wardens occurred on his easement just outside his private property. Stietz has not sued the wardens for trespass; rather, he *606 argues, in defense of his actions, that he did not know these two men were wardens but believed them to be trespassers on private property where Stietz was lawfully present (unlike the wardens). Whether the wardens confronted and seized Stietz on the easement instead of Stietz's private property does not change the fact that the wardens seized Stietz on private property rather than in a public place, absent consent, a warrant, probable cause, exigent circumstances, or any other lawful basis to intrude.
¶ 86. The circuit court's ruling on self-defense and trespass denied Stietz the right to tell the jury his version of events and therefore substantially impaired his right to present a defense. It appears the circuit court's reason for refusing to instruct the jury on trespass arose from the court's mistaken belief that the wardens had authority to be on the private land and therefore could not be trespassers. The circuit court erred. Based on this record, there was no legal basis for the wardens to be on Stietz's (or his uncle's) private property. By entering it merely on a hunch, the wardens exceeded their authority under the law and should be treated as trespassers: " [Wjhere an authority given by law is exceeded, the officer loses the benefit of his justification, and the law holds him a trespasser ab initio although to a certain extent he acted under the authority given." Wallner v. Fidelity & Deposit Co. of Maryland, 253 Wis. 66, 70, 33 N.W.2d 215 (1948). Stietz had the right to present evidence and to argue that these two men—who exceeded their lawful authority by entering private land uninvited, demanding he relinquish his rifle, grabbing him, and forcibly wresting the rifle out of his hands—were trespassers.
*607 f 87. The standard for giving a jury instruction requires that the circuit court instruct the jury on an issue raised by the evidence. See State v. Kramar, 149 Wis. 2d 767, 792, 440 N.W.2d 317 (1989). The evidence presented at trial supports the conclusion that the wardens were trespassers. By prohibiting Stietz's counsel from arguing trespass and refusing to instruct the jury on trespass law, the circuit court prevented Stietz from presenting a full defense to the jury on the two counts of which the jury convicted Stietz.
¶ 88. Count 3 required the State to prove that the wardens were acting with lawful authority. See Wis. Stat. § 946.41(1). Part of Stietz's defense to Count 3 was that because the wardens were trespassers, they acted without lawful authority. Count 6 required the State to prove that the wardens were law enforcement officers acting in an official capacity and whom Stietz had reason to believe were law enforcement officers. See Wis. Stat. § 941.20(lm)(b). Setting aside Stietz's claim that the legislature did not include "conservation wardens" in those listed as "law enforcement officers" for the purposes of this section (which if correct could provide an independent basis for reversal), part of Stietz's defense to Count 6 was that he believed the wardens were trespassers, not law enforcement officers. Whether the wardens were in fact trespassing is relevant to the reasonableness of Stietz's belief that these two men were trespassers rather than wardens.
¶ 89. It is the jury's role to resolve factual disputes and credibility issues. See State v. Poellinger, 153 Wis. 2d 493, 506-07, 451 N.W.2d 752 (1990). This case was full of factual disputes, which the jury evidently resolved in Stietz's favor by acquitting him on four of the six counts. Indeed, the majority correctly concludes that a reasonable jury could find that "the defendant *608 reasonably thought that the two men were trespassers hunting illegally." See majority op. ¶ 68. The circuit court should have allowed the jury to consider trespass. The trespass evidence and argument are also pertinent to the self-defense theory Stietz attempted to present. By limiting Stietz's testimony on trespass, precluding Stietz's attorney from arguing that the wardens were trespassing, and refusing to instruct the jury on trespass law, the circuit court erroneously prevented Stietz's attorney from fully presenting his defense.
f 90. The majority opinion properly analyzes the self-defense error. By not addressing trespass, however, it paves the way for the circuit court on remand to again violate Stietz's right to present his defense, which includes both self-defense and trespass. I would direct the circuit court to honor Stietz's fundamental constitutional right by allowing his testimony and argument that the wardens were trespassers who therefore acted without lawful authority and requiring the circuit court to instruct the jury on trespass.[6]
I—!
I 91. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects . . . against unreasonable searches and seizures," U.S. Const, amend. IV.
No right is held more sacred, or is more carefully guarded, by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.
*609 Terry, 392 U.S. at 9 (quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry, 392 U.S. at 16. There is no authority under the law permitting DNR wardens to wander private property in search of unknown violations of the law. Absent legal authority, a DNR warden may not enter private property to confront and seize an unsuspecting, law-abiding citizen who has fenced in his property and posted "no trespassing" signs.
¶ 92. The open fields doctrine "affords no protection to evidence either on or in the ground" outside of houses and curtilage. Conrad v. State, 63 Wis. 2d 616, 624-25, 218 N.W.2d 252 (1974) (emphasis added). Even though "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment," see Oliver, 466 U.S. at 177 (emphasis added), the Fourth Amendment certainly protects a person from unreasonable seizures on an open field. The open fields exception to Fourth Amendment protection has never been applied solely to a seizure of a person lawfully present on private property, without contraband. To the contrary, "[w]here a person is, there also is the protection of the Fourth Amendment." Conrad, 63 Wis. 2d at 628. "[T]he Fourth Amendment protects people, not places." United States v. Jones, 565 U.S. 400, 406 (2012) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). Fifty years ago, the Supreme Court recognized that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures," Katz, 389 U.S. at 359, acknowledging that Fourth Amendment protections extend beyond property to "safeguard the privacy and *610 security of individuals against arbitrary invasions by governmental officials," Berger v. New York, 388 U.S. 41, 53 (1967) (quoting Camara v. Mun. Ct., 387 U.S. 523, 528 (1967)).
¶ 93. "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citation omitted). "To determine the constitutionality of a seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983) (brackets in original)). The wardens in this case overlooked Stietz's right to be secure in his person under the Fourth Amendment by forcefully disarming him and seizing him and his lawfully possessed rifle with no lawful basis for doing so. The governmental interest in policing hunting violations cannot justify such an intrusion against an individual. These actions, which led to the standoff and the charges against Stietz, are swept under the rug and forgotten. But, had the wardens not trespassed and had they not forcibly wrested away Stietz's rifle, the standoff—leading to six charges—would not have occurred at all.
¶ 94. The people of Wisconsin entrust DNR wardens to protect the state's many natural resources, including public forests and land. In order to enable wardens to fulfill their duties, the people of Wisconsin confer powers on them. These powers are not boundless; they are circumscribed both constitutionally and statutorily and do not include free reign to trespass on private lands at will. The wardens in this case unlawfully entered private land, demanded a legally possessed rifle without explanation, and seized Stietz and *611 his rifle when he did not comply. Whether in an open field or on a public street, the people retain their Fourth Amendment right to be free from "arbitrary and oppressive interference by enforcement officials with [their] privacy and personal security." United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976).
III
¶ 95. Stietz has a fundamental constitutional right to present a defense grounded in the law governing self-defense and trespass. The circuit court erroneously prevented Stietz from presenting his full defense to the jury, and he is entitled to a new trial. The actions precipitating the standoff in this case implicate the right of the people to be free—particularly on their own private property—of unreasonable searches and seizures under the Fourth Amendment. The Constitution prevents DNR wardens from entering fenced and posted private property, and from seizing law-abiding people, unless there is a legal basis for doing so. Here, there was none, which makes the circuit court's decisions on self-defense and trespass erroneous.
¶ 96. For these reasons, I respectfully concur.
¶ 97. I am authorized to state that Justice DANIEL KELLY joins this concurrence, and that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence, except as to Part II.

 There are some limits on the right to present a defense that are not relevant here. See State v. St. George, 2002 WI 50, ¶ 15, 252 Wis. 2d 499, 643 N.W.2d 777.

 The State filed a motion in limine asking the circuit court to prohibit any testimony referring to the wardens as trespassers. The circuit court ruled: "[Stietz] can say that he was patrolling for trespassers, but he can't say that the wardens were trespassing." When Stietz testified "I encountered two trespassers on my property," the circuit court ordered the statement "stricken from the record" and instructed the jury to "dismiss it from your minds entirely and not consider it in your deliberations at all, as though it was never said."

 Stietz says Warden Webster grabbed his shirt before the wardens grabbed his rifle. Both wardens deny grabbing Stietz. For the purpose of this court's review, however, we view the facts in the light most favorable to Stietz. See State v. Head, 2002 WI 99, ¶ 9, 255 Wis. 2d 194, 648 N.W.2d 413.

 See Terry v. Ohio, 392 U.S. 1 (1968).

 Multiple states reject the open fields doctrine with respect to fenced, posted, or otherwise closed off private lands, recognizing an expectation of privacy on the part of landowners, particularly for land with "no trespassing" signs. See State v. Dixson, 766 P.2d 1015, 1024 (Or. 1988) ("[I]f land is fenced, posted or otherwise closed off, one does not enter it without permission or, in the officers' situation, permission or a warrant."); People v. Scott, 593 N.E.2d 1328, 1335-37 (N.Y. 1992) ("A constitutional rule which permits State agents to invade private lands for no reason at all—without permission and in *605 outright disregard of the owner's efforts to maintain privacy by fencing or posting signs—is one that we cannot accept as adequately preserving fundamental rights of New York citizens. .. . [T]he unbridled license given to agents of the State to roam at will without permission on private property in search of incriminating evidence is repugnant to the most basic notions of fairness in our criminal law."); State v. Johnson, 879 P.2d 984, 993 (Wash. Ct. App. 1994) ("[P] olice should not be empowered to invade land closed to the public .. . ." (quoted source omitted)); State v. Bullock, 901 P.2d 61, 75-76 (Mont. 1995) ("[A] person may have an expectation of privacy in an area of land that is beyond the curtilage ... , and . . . where that expectation is evidenced by fencing, 'No Trespassing,' or similar signs, or 'by some other means [which] indicate [s] unmistakably that entry is not permitted,'. . . entry by law enforcement officers requires permission or a warrant." (citation and quoted source omitted; second and third brackets in original)).

 I do not decide whether the language in Stietz's proposed trespass instruction was appropriate; rather, I hold the evidence supported instructing the jury on trespass.