STATE of Wisconsin, Plaintiff-Respondent,

v.

Gregory PECK, Defendant-Appellant.†

Court of Appeals

*Nos. 87–0283–CR, 87–0816–CR. Submitted on briefs December 7, 1987.—Decided February 25, 1988.*

(Also reported in 422 N.W.2d 160.)

† Petition to review pending. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.

625

For the defendant-appellant the cause was submitted on the briefs of *Mark D. Lawton* and *Douglas W. Kammer, S.C.,* of Portage.

For the plaintiff-respondent the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *Thomas J. Balistreri,* assistant attorney general.

Brief of amicus curiae was filed by *Einar H. Tangen* of Wauwatosa on behalf of *ACLU of Wis. Foundation, Inc.*

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J. Gregory Peck appeals from a judgment convicting him of manufacturing controlled substances in violation of sec. 161.41(1)(b), Stats., and from orders denying his motions to suppress evidence, to dismiss the charge, and for a new trial.

The issues are: (1) whether statutes prohibiting the manufacture of controlled substances may be constitutionally applied to a person who uses marijuana for religious purposes; (2) whether law enforcement authorities could seize marijuana growing on Peck's farm without a warrant; (3) whether destruction of all but representative samples of the plants seized from the farm deprived Peck of exculpatory evidence in violation of his right to due process of law; (4) whether the trial court erred in ruling that a potential witness

who refused to testify on fifth amendment grounds was unavailable within the meaning of secs. 908.04(1)(e) and 908.045, Stats., so as to allow admission of her hearsay statements; (5) whether allowing the witness, who was also a codefendant, to claim her fifth amendment privilege in the presence of the jury so prejudiced the defense that a new trial is warranted; and (6) whether the trial court abused its discretion in refusing to instruct the jury on the lesser included offense of possession of marijuana, and in refusing to give Peck's requested "theory of the defense" instruction. We resolve all issues against Peck and affirm.

The basic facts are not in dispute. Peck is a priest in the Israel Zion Coptic Church, a Wisconsin non-stock corporation. Church doctrine dictates the use of marijuana as a "religious sacrament." While the church views smoking marijuana simply "to get stoned" with disfavor, its use by church members as a sacrament is not confined to any particular rite or ritual; rather, worship and "performance of the sacrament" is undertaken whenever and wherever individual members may choose. Their worship, called "reasoning," is carried on "continually."

The church occupies land in rural Vernon County. There are two house trailers on the property, which is accessible only by a rough road. Marijuana was cultivated in several "gardens" on the property. After receiving reports that large quantities of water were being hauled into the area, the Vernon County Sheriff viewed the property from a nearby town road. Using binoculars, he observed what he believed to be marijuana and sent a conservation warden to the property to verify his observations. The warden did so, seizing samples of marijuana, and, after an aerial view

by state justice department officers, the sheriff entered the property and confiscated approximately 1,600 marijuana plants. All were destroyed except for six plants, which were retained as samples.

Peck, who acknowledged that he was the owner of the property, was charged with manufacturing controlled substances. His motions to suppress the seized marijuana and to dismiss the charge on constitutional grounds were denied. He was tried and convicted of the charge and his postconviction motions were denied. Other facts will be discussed below.

## I. THE CONSTITUTIONAL ARGUMENTS

Peck makes three constitutional arguments. First, he contends that the state has failed to show a "compelling state interest" in regulating marijuana use sufficient to override his first amendment right to practice his religion. Second, he maintains that insofar as ch. 161, Stats., relates to marijuana use, it infringes on his right to privacy. Finally, he argues that sec. 161.41(1)(b) unconstitutionally deprives him of his right to equal protection of the laws because the legislature has exempted another church, the Native American Church, from the provisions of the law for its members' "nondrug use of peyote and mescaline in [its] bona fide religious ceremonies ...." Sec. 161.115.

### (a) *The First Amendment*

In determining whether a statute violates the right to free exercise of religion under the first amendment to the United States Constitution and art. I, sec. 18, of the Wisconsin Constitution, any statutory restrictions imposed on the exercise of religion must

be measured against the government interest served by the statute. *State v. Yoder,* 49 Wis. 2d 430, 434, 182 N.W.2d 539, 540 (1971), *aff'd, Wisconsin v. Yoder,* 406 U.S. 205, 230 (1972). The state concedes that Peck is a sincere practitioner of a bona fide religion; that his use of marijuana is a religious practice rooted in his sincere theological beliefs; and that the statutes prohibiting the manufacture of controlled substances impose a burden on Peck's first amendment right to use marijuana in his religious rituals. The question is whether the state can show that it has a compelling interest in regulating such conduct. *Sherbert v. Verner,* 374 U.S. 398, 406 (1963). To infringe upon a person's first amendment prerogatives, the state's interest must be an "overriding" interest, *United States v. Lee,* 455 U.S. 252, 257–58 (1982); a mere showing of a rational relationship will not suffice. *Sherbert,* 374 U.S. at 406.

Peck argues that *Wisconsin v. Yoder* is "the controlling precedent" in this case. We disagree. In that case, the Court held that the state's interest in compulsory education was not so compelling as to override the first amendment rights of Amish citizens to practice their religious faith—which includes opposition to formal education beyond the eighth grade. *Id.,* 406 U.S. at 234, 210. In so holding, the Court was careful to note that Amish educational practices and beliefs did not pose any threat of harm to either the health of Amish children or "to the public safety, peace, order, or welfare . . . ." *Id.* at 230. The Court also recognized that "the power of [a] parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will . . . have a potential for significant social burdens." *Id.* at 233–34. It concluded, however, that no such poten-

tial existed with respect to the Amish because the state had not shown that its inability to enforce school attendance laws would "in any . . . way . . . detract from the welfare of society." *Id.* at 234.

The Wisconsin legislature, in enacting ch. 161, Stats., expressly found that the abuse of marijuana and other controlled substances "constitutes a serious problem for society." Sec. 161.001, Stats. By so finding, and by imposing substantial criminal penalties for manufacturing controlled substances, "[the legislature] has weighed the evidence and reached a conclusion which it is not this court's task to review *de novo.*" *United States v. Rush,* 738 F.2d 497, 512 (1st Cir. 1984), *cert. denied,* 470 U.S. 1004, *reh. denied,* 471 U.S. 1120 (1985). In *Rush,* a case involving an identical "free exercise" challenge to federal drug laws by the Ethiopian Zion Coptic Church, the court, while recognizing conflicting opinions as to whether marijuana is a health hazard and a threat to social welfare or simply a harmless recreational drug, noted that:

> Every federal court that has considered the matter, so far as we are aware, has accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare, and has upheld the criminal sanctions for possession and distribution of marijuana even where such sanctions infringe on the free exercise of religion. *Id.* at 512.[1]

---

[1]*See e.g., United States v. Middleton,* 690 F.2d 820, 825–26 (11th Cir. 1982), *cert. denied,* 460 U.S. 1051 (1983); *United States v. Spears,* 443 F.2d 895, 896 (5th Cir. 1971), *cert. denied,* 404 U.S. 1020 (1972); *Leary v. United States,* 383 F.2d 851, 859–62 (5th Cir. 1967), *rev'd on other grounds,* 395 U.S. 6 (1969); *Olsen v. State of Iowa,* 649 F. Supp. 14, 16 (S.D. Iowa), *aff'd,* 808 F.2d 652 (8th Cir. 1986);

A majority of state courts considering the question have reached a similar result.[2]

The Wisconsin legislature has determined that one growing or possessing marijuana should be subjected to criminal penalties. Such legislation "reflects a legislative judgment that prohibition of [such activities] is a substantial interest of the State." *State v. Brashear,* 593 P.2d 63, 70 (N.M. App. 1979). Where, as here, the legislative response has a rational basis, we may not substitute our own judgment for that of the legislature. *State v. Rocheleau,* 451 A.2d 1144, 1148 (Vt. 1982), comparing *United States v. Carolene Products Co.,* 304 U.S. 144, 153 (1938).

Preservation of the public health and safety is the obvious purpose underlying Wisconsin's drug laws, and we see a compelling state purpose in the regulation of marijuana and other controlled substances. On this record, and in light of the nearly unanimous rulings of other state and federal courts on the issue, we conclude that the state interest is of sufficient magnitude to override Peck's first amendment interest in using the drug as a daily continual sacrament in

*Randall v. Wyrick,* 441 F. Supp. 312, 316 (W.D. Mo. 1977); *United States v. Kuch,* 288 F. Supp. 439, 448 (D.D.C. 1968).

[2]*See Whyte v. United States,* 471 A.2d 1018, 1021 (D.C. App. 1984); *Town v. State ex rel. Reno,* 377 So. 2d 648, 651 (Fla. 1979), *appeal dism., cert. denied,* 449 U.S. 803, *reh. denied,* 449 U.S. 1004 (1980); *State v. Blake,* 695 P.2d 336, 340 (Haw. App. 1985); *State v. Olsen,* 315 N.W.2d 1, 8–9 (Iowa 1982); *State v. Bullard,* 148 S.E.2d 565, 568–69 (N.C. 1966), *cert. denied,* 386 U.S. 917 (1967); *State v. Soto,* 537 P.2d 142, 144 (Or. App. 1975), *cert. denied,* 424 U.S. 955 (1976); *Gaskin v. State,* 490 S.W.2d 521, 523–25 (Tenn.), *appeal dism.,* 414 U.S. 886 (1973); *State v. Rocheleau,* 451 A.2d 1144, 1148–49 (Vt. 1982).

his admittedly sincere role as a member of the Israel Zion Coptic Church.[3]

### (b) *Right of Privacy*

Peck argues that he has a right to "privacy in [his] home" with which the government may not unreasonably interfere, and that applying the controlled substance law to him constitutes such interference. The argument, in essence, is that the state has failed to show a compelling interest sufficient to justify the law's intrusion "into his home."

First, we believe the preceding discussion of the state's interest in regulating the manufacture, use and distribution of controlled substances is adequate to defeat Peck's argument on this point. Second, the marijuana was being cultivated in several separate "gardens" on Peck's farm, and fields used for growing crops are not generally considered areas, such as a home, where one has a reasonable expectation of privacy. *Oliver v. United States,* 466 U.S. 170, 178–81 (1984). Finally, the great majority of courts recognize that private use of controlled substances is no more protected than public use.[4]

---

[3]Peck suggests, without elaboration, that the state could accomplish its goals by developing "reasonable time, place and manner restrictions on the use of marijuana." Any such action, however, would be for the legislature, not the courts, to undertake.

[4]*See e.g. Leary v. United States,* 544 F.2d 1266, 1270 (5th Cir. 1977); *Wolkind v. Selph,* 495 F. Supp. 507, 516 (E.D. Va. 1980), *aff'd,* 649 F.2d 865 (4th Cir. 1981); *Nat. Org. for Reform of Marijuana Laws v. Bell,* 488 F. Supp. 123, 133–34 (D.D.C. 1980); *State v. Kelly,* 678 P.2d 60, 70 (Idaho App.), *cert. denied,* 469 U.S. 918 (1984); *People v. Brisco,* 397 N.E.2d 160, 164 (Ill. App. 1979); *State v. Chrisman,* 364 So. 2d 906, 907–08 (La. 1978) (and cases

An individual's right to privacy is not absolute; it may be outweighed by compelling societal interests. *In re Paternity of D.A.A.P.,* 117 Wis. 2d 120, 129, 344 N.W.2d 200, 204 (Ct. App. 1983). The state interest in regulating controlled substances, when weighed against Peck's interest in growing large quantities of marijuana on his farm, is such an interest.

### (c) *Equal Protection*

Peck contends that the statute on which he was convicted, sec. 161.41(1)(b), Stats., denies him the equal protection of law because a related statute exempts the Native American Church from ch. 161 penalties with respect to its members' religious use of peyote and mescaline.

One challenging the constitutionality of a statute bears a heavy burden. All statutes are presumed to be constitutional, and the challenger must prove unconstitutionality beyond a reasonable doubt. *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784, 792 (1973). The presumption is a strong one, and we will construe a statute to preserve its constitutionality if it is at all possible to do so. *State v. Cissell,* 127 Wis. 2d 205, 214–15, 378 N.W.2d 691, 695 (1985), *cert. denied,* 475 U.S. 1126 (1986).[5]

cited); *People v. Williams,* 355 N.W.2d 268, 268 (Mich. App. 1984); *State v. Kells,* 259 N.W.2d 19, 24 (Neb. 1977); *State v. Smith,* 610 P.2d 869, 880–81 (Wash.) (and cases cited), *cert. denied,* 449 U.S. 873 (1980).

[5]Both the state and the *amicus curiae* supporting Peck's position agree that one challenging a statute on equal protection grounds must prove its unconstitutionality beyond a reasonable doubt. Peck disagrees, arguing that because, in his view, the

Peck argues that the law, by exempting one church but not others, constitutes an unreasonable classification and thus a violation of the equal protection clause. We disagree.

■

It is true that peyote and mescaline are controlled substances and that the law provides penalties for their possession and use. Sec. 161.14(4)(m), Stats. It is also true that sec. 161.115 provides that ch. 161 "does not apply to the nondrug use of peyote and mescaline in the bona fide religious ceremonies of the Native American Church." A similar exemption appears in federal drug laws. 21 C.F.R. sec. 1307.31 (1987). Here, too, courts considering the question have uniformly held that the separate treatment of the Native American Church does not result in an unconstitutional classification because it is based on the unique cultural and historic attributes of Native Americans.[6]

statutes unreasonably classify religions, constitutional provisions such as art. I, sec. 18 of the Wisconsin Constitution, which prohibit giving any preference to religious establishments, shift the burden to the state to show "a compelling government interest in treating one religion different than another." He cites no supporting authority, however. The supreme court has consistently recognized that "[w]hen a statutory classification is challenged as violative of the equal protection clause, the challenger must prove abuse of legislative discretion beyond a reasonable doubt." *Sambs v. City of Brookfield,* 97 Wis. 2d 356, 370, 293 N.W.2d 504, 511, *cert. denied,* 449 U.S. 1035 (1980).

[6]*See Leary,* 383 F.2d at 861; *United States v. Warren,* 595 F. Supp. 595, 600–01 (D.N.D. 1984); *Peyote Way Church of God, Inc. v. Smith,* 556 F. Supp. 632, 637–40 (N.D. Tex. 1983), *remanded on other grounds,* 742 F.2d 193 (5th Cir. 1984); *Whyte,* 471 A.2d at 1021.

## II. SEIZURE AND DESTRUCTION OF THE MARIJUANA

### (a) *Seizure*

The state concedes that at least some of the marijuana seized was within Peck's curtilage, and thus the search was subject to fourth amendment considerations. It is well established, however, that "[o]nly those government intrusions that infringe upon a privacy interest violate the fourth amendment." *State v. Bauer,* 127 Wis. 2d 401, 405, 379 N.W.2d 895, 897 (Ct. App. 1985). It follows that "[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351 (1967). And this is true even where the area in question is part of the curtilage, for there can be no reasonable expectation of privacy if the area in question is in plain sight or "open to the public." *Conrad v. State,* 63 Wis. 2d 616, 630, 634, 218 N.W.2d 252, 259, 261 (1974). We have interpreted the phrase, "open to the public," as focusing on the defendant's actions:

> *Conrad* properly links concepts of public or semi-public with considerations of plain view or subjective waiver of a reasonable expectation of privacy. The emphasis on the inquiry, therefore, is not the ability of third parties to gain access to or view the property but rather the manner in which the possessor holds the property out to the public. This test properly places the focus of the inquiry not on the state's airborne activities but rather on the citizen's earthbound ones. Moreover, it allows the citizen an opportunity to demonstrate his [or her] expectations of privacy by the manner in which he [or she] veils or conceals his [or her] property from

638

others. By taking the appropriate *reasonable* steps exhibiting this subjective expectation of privacy, the citizen holds it within his [or her] own power to determine whether government intrusions into areas of his [or her] curtilage violate fundamental rights. *State v. Grawien,* 123 Wis. 2d 428, 436–37, 367 N.W.2d 816, 820 (Ct. App. 1985) [emphasis in original].

At the suppression hearing, Vernon County Sheriff Geoffrey Banta testified that he viewed Peck's property from a town road, using binoculars to look across a forty-acre parcel of adjoining land. From that vantage point, he saw what appeared to be marijuana growing on Peck's land. He saw no signs forbidding trespassing on the adjacent property. The conservation warden sent to the property by Banta walked from the road through a wooded area and, when he came to the edge of the woods, he saw three patches of marijuana. To the warden's knowledge, the wooded area is frequented by hunters, although not in the month of August, when the marijuana was seized. The warden did not observe any "no trespassing" or similar signs in the area. Finally, a state justice department agent flew over Peck's property and observed (and photographed) marijuana growing at several locations on the land.

In *Grawien,* we recognized that where a marijuana patch is visible from an adjoining field, the officer's observations do not constitute a search. *Id.,* 123 Wis. 2d at 437, 367 N.W.2d at 820. The observations of both Sheriff Banta and the conservation warden were made from adjoining or nearby lands.[7] Indeed, the sheriff

---

[7]Peck states in his brief that he was the owner of the wooded land from which the warden first saw the marijuana, and thus he

was standing on a public road when he first observed the marijuana. Since the subsequent "searches" and the ultimate seizure were based on Sheriff Banta's initial observations of the marijuana, the question is whether those observations constituted a search within the meaning of the fourth amendment.

Peck contends that because Banta, looking across a forty-acre field, used binoculars to aid his view of the plants, they were not in "plain view" and their eventual seizure must be suppressed. We disagree. Even where an area is wholly within the curtilage, if it is nonetheless "in plain sight ... the necessity for a warrant is obviated." *Grawien,* 123 Wis. 2d at 436, 367 N.W.2d at 819–20. "[O]bservations from outside the curtilage of activities within are not generally interdicted by the Constitution." *Fullbright v. United States,* 392 F.2d 432, 434 (10th Cir.), *cert. denied,* 393 U.S. 830 (1968).

██

This is not a case where the police used binoculars to peer into a house, apartment, or other enclosed building. Such an intrusion would plainly violate a person's expectation of privacy. *See United States v. Taborda,* 635 F.2d 131, 139 (2d Cir. 1980); *State v. Knight,* 621 P.2d 370, 373 (Haw. 1980). However, if the area is one which is otherwise exposed to view—if the defendant did not have a reasonable expectation of privacy—the use of binoculars or other vision enhancement devices does not violate fourth amendment privileges. *See United States v. Lace,* 669 F.2d 46, 51

had no right to be there. There is no evidence in the record of the suppression hearing as to Peck's ownership of the adjoining woodland, however, and he has not referred us to any other place in the record where such evidence was offered. We thus disregard his unsupported statement.

(2d Cir. 1982) (use of binoculars to observe area between defendant's house and barn which was visible from road); *United States v. Allen,* 633 F.2d 1282, 1290–91 (9th Cir. 1980), *cert. denied,* 454 U.S. 833 (1981) (binocular surveillance of ranch fields); *United States v. Minton,* 488 F.2d 37, 38 (4th Cir. 1973), *cert. denied,* 416 U.S. 936 (1974) (use of binoculars to observe defendant loading illicit whiskey from a warehouse or barn on his property). A majority of state cases take the same view. *See* Annotation, *Observation Through Binoculars as Constituting Unreasonable Search,* 48 A.L.R.3d 1178, sec. 7 (1973).

Peck argues, however, that he had a reasonable expectation of privacy in the marijuana plots on his property because: (1) the property was "remote" and the road to it was rough and twisting; (2) there were food plants growing along with the marijuana; (3) the area in which the gardens were located was mowed and used by grazing animals and for children's play; and (4) there were buildings on the perimeter of the area in which the gardens were planted. The state points out, on the other hand, that the area (and the marijuana) was readily visible from adjoining woodlands on the north and from croplands on the south, and that, as indicated, it could be seen with the aid of binoculars from a town road across a forty-acre farm field.

As we have said, the emphasis in any inquiry into a person's reasonable expectation of privacy is not on the ease or difficulty with which third parties might gain access to it, but on the manner in which the possessor "veils or conceals his [or her] property from others." *Grawien,* 123 Wis. 2d at 436–37, 367 N.W.2d at 820. Other than the natural isolation of the

property (not so isolated that it could not be seen from a public road, however), Peck made no effort to screen or conceal the garden plots. He constructed no fences or barriers to vision. The plants were uncovered, growing in several separate plots in an otherwise mowed area of an irregularly shaped 400 by 500 foot cleared parcel of land. Under these circumstances, we do not believe Peck has shown, either directly or inferentially, "a subjective and reasonable expectation of privacy" in the area. *Conrad,* 63 Wis. 2d at 631, 218 N.W.2d at 260. Thus, even if the entire area in which the marijuana was growing could be considered curtilage (and we do not so hold), it was accessible to public view from a nearby road, and because Peck did not have a reasonable, demonstrable expectation of privacy in the area, the fact that it may lie within the curtilage is immaterial. *Id.* at 633, 218 N.W.2d at 261. As a result, Banta's initial "search," in which, aided by binoculars, he identified marijuana growing on Peck's property, did not violate Peck's fourth amendment rights, and the trial court properly denied his suppression motions.

### (b) *Destruction of the Plants*

As indicated, the police seized in excess of 1,600 marijuana plants from Peck's "gardens." Saving only several representative samples, they destroyed the rest. Peck argues that because there are "male" and "female" marijuana plants, the because "'for all practical purposes[,]' the male ... plant is not sold on the street," destruction of the bulk of the crop prohibited him from offering evidence of the male/female plant ratios, which, he asserts, would be exculpatory. We assume his position to be if all 1,600

plants had been retained, many of them might have been male and thus difficult to sell on the street. Such evidence would, he assets, be "surely exculpatory as to whether [he] intended the marijuana for use by others," and he argues that, as a result, its unavailability violates his right to due process of law.

Due process, however, does not require the state to preserve evidence which is merely potentially exculpatory. *State v. Holt,* 128 Wis. 2d 110, 132, 382 N.W.2d 679, 690 (Ct. App. 1985). Peck has not satisfied us that the police had any obligation to retain all the plants seized. He concedes that male plants die after pollination and are removed from cultivated fields at that time. He does not dispute that he was cultivating the marijuana, and we assume that, as a result, he had some knowledge of the plants' gender before they were destroyed.

On these facts, Peck's claim that the "unobtainable evidence" was exculpatory is speculative. Nor, in light of his conceded status as a marijuana grower, has he shown that he would be unable to obtain or present evidence of the plants' gender on his own. In order to meet the constitutional standard Peck seeks to impose, he must show that the evidence was exculpatory and that he would be unable to obtain comparable evidence by other means. *Holt,* 128 Wis. 2d at 132–33, 382 N.W.2d at 690. He has shown neither.

### III. WITNESS UNAVAILABILITY

One of Peck's codefendants was Ellen Procalamos, who lived with him on the farm. She was called as a

witness at Peck's trial but declined to testify, asserting her fifth amendment privilege against self-incrimination. The trial court ruled that, as a result, she was unavailable as a witness within the meaning of sec. 908.045(4), Stats., which allows hearsay statements against interest to be introduced if the witness is "unavailable." A police officer was then permitted to testify that Procalamos had told him that she lived on the property with Peck and that they were growing marijuana there. Peck appears to acknowledge the well established rule that a witness who invokes his or her privilege against self-incrimination is unavailable within the meaning of the rule. *West v. State,* 74 Wis. 2d 390, 400, 246 N.W.2d 675, 681 (1976). He argues, however, that Procalamos was not unavailable because the state could have granted her immunity from prosecution and the court could then use its contempt powers to compel her to testify.

Peck's argument is based on *Pleau v. State,* 255 Wis. 362, 38 N.W.2d 496 (1949). In that case, a witness who had already been convicted as an accomplice in the crime for which the defendant was being tried was asked whether the defendant was with him on the night in question. When the witness refused to answer on grounds that he had already answered the questions in an earlier hearing, he was declared to be a hostile witness and the court allowed his preliminary hearing testimony to be read to the jury. The supreme court held this to be error, stating that "[w]here a witness for the state becomes hostile and refuses voluntarily to [testify]," the trial court has the duty to compel the testimony. *Id.* at 366, 38 N.W.2d at 498.

We are not persuaded. First, *Pleau* does not speak to the fifth amendment privilege or to the concept of

unavailability as a condition precedent to the admission of hearsay evidence. Second, sec. 908.04(1)(a), Stats., which was adopted after *Pleau,* specifically defines "unavailability" as including, *inter alia,* situations where the witness "[i]s exempted by the ruling of the judge on the ground of privilege from testifying ...." *Pleau* simply has no bearing on the issue before us.

## IV. INVOCATION OF THE PRIVILEGE

Procalamos was called to the stand, answered one question and then, in the jury's presence, asserted her testimonial privilege, Peck argues that "[t]here can be no question that this unfairly prejudiced [him]," because it established "'guilt by association.'" The argument is not otherwise explained and Peck has not offered any authority on the point. We need not consider if further. *State v. Shaffer,* 96 Wis. 2d 531, 545–46, 292 N.W.2d 370, 378 (Ct. App. 1980).

## V. THE JURY INSTRUCTIONS

The trial court denied Peck's request for an instruction on the "lesser included offense" of simple possession of marijuana on grounds that possession is not an element of manufacturing a controlled substance, the crime with which he was charged. A lesser included offense is, by definition, one included within the greater offense. *State v. Richards,* 123 Wis. 2d 1, 6, 365 N.W.2d 7, 9 (1985).

The heart of the offense of possession under sec. 161.41(3)(m), Stats., is, of course, possession of a controlled substance. Possession, however, is not an

element of the offense of manufacturing a controlled substance under sec. 161.41(1)(b). *State ex rel. Bell v. Columbia County Ct.,* 82 Wis. 2d 401, 406, 263 N.W.2d 162, 165 (1978). As a result, the former cannot be a lesser offense included within the latter, and the trial court properly declined to give the instruction.

Peck also argues that the court erred in refusing to give his requested "theory of the defense" instruction. Peck's defense was that he was not producing the marijuana for commercial profit, but only for use by himself and other members of his church. He requested the court to instruct the jury that he could only be convicted if he intended to produce the marijuana, not for church members, but "for profit."

A defendant is not entitled to an instruction on a defense theory which does not constitute a valid, applicable defense to the crime charged. Peck's requested instruction fails this test for two reasons.

First, "profit" is not an element of the offense of manufacturing controlled substances under secs. 161.41(1)(b) and 161.01(13), Stats. Peck's argument that the "profit" element is supplied by the legislative declaration of intent in secs. 161.001(1) and (2) is misplaced. It is true that those sections declare that "[p]ersons who illicitly traffic commercially in controlled substances constitute a substantial menace to the public" and should be punished severely. Section 161.001(3), however, makes it clear that ch. 161 is also directed toward those who "casually use or experiment with controlled substances," and the statute's introductory paragraph declares "the abuse of controlled substances" to be "a serious problem for society." Section 161.001 does not add a "profit" or "commercial" element to sec. 161.41(1)(b).

Second, Peck's requested instruction misstates the law by directing acquittal if he is found to be producing the marijuana as part of his religion. As explained in preceding sections of this opinion, the state may regulate such activities if it has a compelling interest in doing so.

*By the Court.*—Judgment and orders affirmed.