(955 P.2d 133)

No. 78,189
No. 78,190

STATE OF KANSAS, *Appellee*, v. JOE McBRIDE and CONNIE McBRIDE, *Appellants*.

Opinion filed February 27, 1998.

*Steven R. Zinn*, deputy appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellants.

*Bobby J. Hiebert, Jr.*, legal intern, *Tony W. Rues*, assistant district attorney, *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before LEWIS, P.J., RULON, J., and WAHL, S.J.

WAHL, J.: The appellants, Joe and Connie McBride, appeal their convictions for one count each of cultivation of marijuana, K.S.A. 1996 Supp. 65-4163(a)(3), and failure to affix a drug tax stamp, K.S.A. 79-5201 *et seq.*

On July 17, 1995, Topeka police officers went to the Pine Ridge public housing development to check the status of an apartment at 2925 S.E. 10th Street that was the east dwelling in a duplex. The west residence, 2921 S.E. 10th Street, belonged to the appellants. The police were investigating the east dwelling because conflicting reports indicated it was either used as a tenant center, was occupied partially by the McBrides, or was vacant. The executive director of the Topeka Housing Authority, Lana Balka, testified at the prelim-

inary hearing that Joe McBride had been issued a key to the east dwelling to operate a tenant center. Upon arriving at the McBrides' residence, Officer Francheska Hunt met Connie McBride at the front of the apartment while Officer James Gilchrist went to the back of the duplex in order to keep anyone from leaving. While at the back door, Officer Gilchrist observed numerous marijuana plants growing in a vegetable garden and in other areas behind the duplex. Subsequently, the McBrides were each arrested and charged in amended complaints with cultivation of marijuana, failure to affix a tax stamp, and possession of drug paraphernalia. The cases were consolidated in the district court.

The McBrides filed motions to dismiss on First Amendment free exercise of religion grounds, claiming they were members of the Rastafarian faith and the use of marijuana was essential to the practice of their religion. At a hearing on the motions, Paul Mirecki, University of Kansas Associate Professor of Religious Studies, testified the Rastafarian faith is a viable religion practiced in North America, the Caribbean, and West Africa, with "tens of thousands" of adherents. He stated Rastafarian beliefs are based in the Judeo-Christian tradition and on the prophecies of Haile Selassie of Ethiopia, whom Rastafarians believe to be God incarnate. Mirecki also testified the use of marijuana was central to religious practices for Rastafarians. Marijuana, or "ganja" in Rastafarian parlance, is considered a sacrament, and inhaling the smoke of the burning plant contributes to the spiritual growth of the soul and knowledge of God, so much so that without ganja, spiritual self-consciousness cannot be recognized. Mirecki testified he believes Rastafarians cannot practice their religion without the use of marijuana.

Both appellants testified at the hearing on the motions to dismiss. Connie McBride testified she had been a Rastafarian for 15 to 20 years and she could not practice her religion without using marijuana. Joe McBride stated he had been a Rastafarian for 15 years and the God he worshipped was the same God worshipped by Christians, Jews, Muslims, and Buddhists. He also stated marijuana was essential to his connection with God or "Jah," as he called the Rastafarian deity, and that the plants in his garden were grown for religious use only. He emphasized that recreational use

of marijuana was improper. He also testified there was no limit on the quantity of marijuana consumed in his religion, nor is there a limit on when it is to be used.

The motion to dismiss was denied by the district court judge, who questioned whether the McBrides were "legitimate practitioners" of the Rastafarian faith because the quantity of marijuana found at their residence was so large. The judge also noted that religious practice could be restricted in the public interest and concluded that unless the McBrides could show that 86 plants were required to practice their religion, the issue of whether they were bona fide Rastafarians was moot. The State then filed a motion in limine to prohibit the McBrides from asserting a free exercise of religion argument at trial. The judge reserved judgment on the motion until trial.

On the day of trial, the court granted the State's motion in limine. The judge ruled this was a "cultivation with the intent to distribute or sell case," and "nothing before this Court suggests that this religion requires distribution, cultivation of this particular product or this particular illegal substance." Counsel for the McBrides objected to the judge's distribution statement, and the State acknowledged the case charged only cultivation and tax stamp violations. The judge, however, did not change his ruling. The parties then entered a stipulation of facts stating the McBrides possessed 86 marijuana plants weighing 6.5 pounds, which they used for religious purposes. The State stipulated the McBrides were members of the Rastafarian faith. Based on the stipulation, the trial court found the McBrides guilty of cultivation and of tax stamp violations, but acquitted them of the paraphernalia charges. The McBrides were sentenced to probation. They filed a timely notice of appeal.

The McBrides argue the district court abused its discretion when it precluded their free exercise of religion defense by granting the State's motion in limine. See generally *State v. Stallings*, 262 Kan. 721, 726, 942 P.2d 11 (1997). As a threshold matter, they argue that the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.* (1994), requires the State to prove that laws of general applicability which burden the practice of one's

religion, such as the drug statutes in this case, serve a compelling governmental interest and are the least restrictive means of accomplishing that end. This is an issue of first impression in Kansas. The interpretation and application of a statute is a question of law over which this court has de novo review. See *State v. Donlay*, 253 Kan. 132, 133-34, 853 P.2d 680 (1993).

The United States Congress enacted the RFRA in 1994 to overturn *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990). In *Smith*, the United States Supreme Court ruled that laws of general applicability which incidentally burden the free exercise of religion need not pass strict scrutiny. 494 U.S. at 886 n.3. The Supreme Court let stand a State of Oregon agency decision denying unemployment compensation benefits to two Native American employees who had been dismissed from a drug rehabilitation center for using peyote in a Native American Church (NAC) ceremony. The Court ruled that because the use of peyote was generally prohibited under Oregon law, and unemployment benefits in Oregon are not awarded to employees dismissed for such misconduct, the State of Oregon did not infringe upon the workers' constitutional right to freely practice their religion. 494 U.S. at 890.

The RFRA reinstated the strict scrutiny test for all state and federal laws of general applicability that incidentally burden one's ability to practice religion and, in so doing, set aside *Smith* by legislative fiat. 42 U.S.C. § 2000bb(b)(1), (2) (1994); 42 U.S.C. § 2000bb-3 (1994). Because the State stipulated the McBrides were Rastafarians, the appellants contend the RFRA requires the State to show that K.S.A. 1996 Supp. 64-4163(a)(3), marijuana cultivation, and K.S.A. 79-5201 *et seq.*, tax stamp, enforce a compelling governmental interest in the absence of less restrictive alternatives. They claim the district court erred because it never required the State to make this showing despite the fact they were arrested for cultivation of marijuana rather than mere possession. The appellants make their argument without consideration of the decision in *City of Boerne v. Flores*, 521 U.S. 507, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997).

In *Flores*, the United States Supreme Court overturned the RFRA on separation of powers and federalism grounds. Noting that the United States Constitution envisions a government of enumerated powers in which judicial authority to interpret the law is well established, the Supreme Court struck down the RFRA as exceeding the scope of Congressional authority. 521 U.S. at 516, 536. It also ruled that while section 5 of the Fourteenth Amendment does allow Congress to enforce the Free Exercise Clause of the First Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 84 L. Ed. 1213, 60 S. Ct. 900 (1940), it does not allow Congress the power to alter the meaning of a constitutional provision. *Flores*, 521 U.S. at 519. Accordingly, the Supreme Court ruled the RFRA to be unconstitutional.

The McBrides' argument that K.S.A. 1996 Supp. 65-4163(a)(3) and K.S.A. 79-5201 *et seq.* must pass strict scrutiny has been rendered moot by *Flores*. While it is true that a motion in limine may not be used to choke off a legitimate defense, *State v. Irons*, 250 Kan. 302, 309, 827 P.2d 722 (1992), a defendant has no legal right to present a defense that is without merit. The district court granted the motion in limine because it did not believe the Rastafarian faith required an adherent to cultivate nearly 100 marijuana plants to practice the religion, and, therefore, the RFRA did not apply. Whether the district court was correct in this interpretation of the RFRA is now irrelevant, and any potential error from this ruling is harmless beyond a reasonable doubt in light of *Flores*. See *State v. McClanahan*, 259 Kan. 86, 102, 910 P.2d 193 (1996). A state may pass a law of general applicability that incidentally burdens the practice of religion without violating the First Amendment. *Smith*, 494 U.S. at 886 n.3. Both K.S.A. 1996 Supp. 65-4163(a)(3) and K.S.A. 79-5201 *et seq.* apply to everyone in the state of Kansas and regulate private conduct as it relates to drugs and public safety. Such laws are clearly valid despite incidental burdens they place on the practice of some religions. Appellants' argument that the district court abused its discretion is without merit.

Appellants also argue the State cannot prosecute them for using marijuana in the practice of their religion because the State allows

members of the NAC to use peyote in their religious ceremonies. See K.S.A. 65-4116(c)(8). Appellants reason that because both marijuana and peyote are controlled substances under K.S.A. 1996 Supp. 65-4105(d)(16) and (19), the State violates both the Establishment and Equal Protection Clauses of the United States Constitution by granting a religious exemption to members of the NAC and not to Rastafarians. Appellants' argument presents a question of law over which this court's review is unlimited. See *Donlay*, 253 Kan. at 133-34. This is also an issue of first impression in Kansas.

An analysis of K.S.A. 65-4116(c)(8) in the context of an Equal Protection-Establishment Clause challenge requires an examination of the history of the statute and the state and federal policy which underlies it. The Kansas Legislature passed K.S.A. 65-4116(c)(8) in order to conform Kansas law to those aspects of the United States Code that enacted the federal policy of preserving Native American culture and supporting tribal self-government. See Minutes of the Senate Committee on Public Health and Welfare, February 27, 1981, p. 1 (statement of Senator John Chandler). The interaction between federal and state policy regarding Native American affairs warrants some discussion.

Native American tribes have been described as domestic dependent nations. *Cherokee Nation v. Georgia*, 30 U.S. (5 Peters) 1, 17, 8 L. Ed. 25 (1831). This is the first principle of modern federal-tribal relations. The doctrine of trust responsibility, under which the federal government is required to promote tribal self-government and cultural integrity in the context of the domestic dependent nation classification, provides the legal framework for this relationship. See *Morton v. Mancari*, 417 U.S. 535, 541-42, 41 L. Ed. 2d 290, 94 S. Ct. 2474 (1974).

In *Mancari*, the Supreme Court ruled that in order to meet this trust responsibility, special rights and status can be afforded Native Americans that would otherwise be unconstitutional so long as the law is rationally connected to fulfilling the trust responsibility. 417 U.S. at 555. The Supreme Court held in *Mancari* that the Bureau of Indian Affairs' practice of hiring Native Americans before other applicants was not violative of Fifth Amendment due process guarantees or federal civil rights laws. The Court reached this ruling in

significant part based upon the federal obligation to promote tribal self-government in the context of the tribes' dependent nation status. 417 U.S. at 551-53. Federal law promoting tribal self-government and Native American welfare is not, therefore, premised on racial distinctiveness; rather, such laws are based upon the political relationship existing between tribal and federal governments which predates the United States Constitution. 417 U.S. at 554. It is pursuant to the trust responsibility that the many federal enactments relating to Native Americans and the religious use of peyote have been issued. See generally H.R. Rep. No. 103-675, 103d Cong., 2d Sess. 2-5 (1994), reprinted in 1994 U.S. Code Cong. & Ad. News 2404-2407 (discussing history of peyote exemption).

The federal peyote exemption has been in effect for some time. In 1971, the Drug Enforcement Administration (DEA) adopted a regulation which expressly allows the NAC to use peyote in its ceremonies notwithstanding the criminalization of peyote at 21 U.S.C. § 812(c)(12) (1970). See 21 C.F.R. 1307.31 (1997). At a congressional hearing at which this regulation was discussed, the Bureau of Narcotics and Dangerous Drugs (now the DEA) stated it regarded NAC as *sui generis* and that NAC members' right to consume peyote derived from that status. See *U.S. v. Boyll*, 774 F. Supp. 1333, 1339 (D. N.M. 1991).

Likewise, Congress adopted the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996, in August 1978, as a joint resolution stating the federal policy of protecting and preserving Native American religious traditions. See H.R. Rep. No. 85-1308, 95th Cong., 2d Sess. 1-5 (1978), reprinted in 1978 U.S. Code Cong. & Ad. News 1262-1266 (statute is remedial law to correct prior abuses of Native American culture). Furthermore, in 1994, Congress amended AIRFA to include an exemption to all federal and state drug laws to allow the use of peyote pursuant to any traditional Native American religion. 42 U.S.C. § 1996a(a), (b) (1994). While the fate of the 1994 amendments might be unclear in light of *Flores*, AIRFA and its amendments fall squarely within the ambit of the trust responsibility.

Senator Chandler stated K.S.A. 65-4116(c)(8) was meant to bring Kansas law in line with federal law legalizing peyote use on

federal lands. In this way, the Kansas Legislature brought the federal trust responsibility into the realm of state law by passing a statute promoting tribal welfare. The importation of the federal trust responsibility into the realm of state-tribal relations by the State of Kansas is by no means improper and has been sanctioned by other courts. See, *e.g., Livingston v. Ewing,* 601 F.2d 1110, 1115-16 (10th Cir.), *cert. denied* 444 U.S. 870 (1979) (city ordinance promoting Native American crafts enacted under state trust responsibility); *St. Paul Intertribal Housing Bd. v. Reynolds,* 564 F. Supp. 1408, 1412 (D. Minn. 1983) (state Indian housing program under trust responsibility); *Peyote Way Church of God, Inc. v. Thornburgh,* 922 F.2d 1210, 1219 (5th Cir. 1991) (acknowledging state action under trust responsibility but questioning the scope of *Reynolds*).

While Kansas courts have not addressed whether a peyote exemption for NAC members is constitutional, federal and other state courts have. The analysis set forth in those cases is persuasive. Generally, courts have analyzed those cases in light of the Equal Protection and Establishment Clauses simultaneously. Applied to the arguments of the McBrides, the threshold question in these cases is whether the Rastafarian appellants are similarly situated to those persons covered by the applicable peyote exemption statute. See *Olsen v. Drug Enforcement Admin.,* 878 F.2d 1458 (D.C. Cir. 1989), *cert. denied* 495 U.S. 906 (1990) (not similarly situated); *United States v. Rush,* 738 F.2d 497, 513 (1st Cir. 1984), *cert. denied* 470 U.S. 1004 (1985) (same); *United States v. Warner,* 595 F. Supp. 595, 600-01 (D.N.D. 1984) (same); see also *State v. Peck,* 143 Wis. 2d 624, 637, 422 N.W.2d 160 (Ct. App. 1988) (state peyote exemption upheld because of unique historic and cultural attributes of Native Americans).

Because the McBrides are not similarly situated to the members of the NAC for purposes of K.S.A. 65-4116(c)(8), they are not entitled to relief under an Equal Protection-Establishment Clause theory. The McBrides are not similarly situated for three reasons: (1) Peyote is consumed by the NAC members only at specific and infrequent religious ceremonies, whereas Rastafarians may consume marijuana in any quantity at any time; (2) peyote generally

is not abused at the same rate as marijuana; and (3) the Kansas and federal NAC exemptions were passed under the ambit of the federal trust responsibility, which seeks to preserve the cultural and political integrity of Native American tribes. We examine each of these three reasons.

First, Rastafarians are not similarly situated to NAC members because of the uncontrolled use to which they put marijuana in their religious practice. See *Olsen*, 878 F.2d at 1463-64. Joe McBride testified that his religion places no limitation on how much marijuana he smokes or at what time of the day he smokes it. Such practices have been noted by other courts addressing the disparate treatment accorded Rastafarians and NAC members under federal law. See *Olsen*, 878 F.2d at 1464. These practices make the administration of a regulatory scheme for the religious use of marijuana nearly impossible because of widespread and uncontrolled usage.

Rastafarian use of marijuana stands in stark contrast to the practices of NAC regarding peyote. Peyote is used by NAC members in ceremonies called "road meetings," usually between midnight and dawn. The ceremonies themselves are elaborate and lengthy and include the services of a tribal elder called a "roadman" and other assistants who prepare the site and procure the tepee or lodge for the meeting. The inherent complexity and planning required for such a gathering does not appear to promote the uncontrolled use of an otherwise controlled substance under Kansas law. See *Boyll*, 774 F. Supp. at 1335-36. NAC chapters issue membership cards to their congregants so peyote use can be easily monitored. In this same manner, the federal DEA has established and administers a licensing system for peyote dealers in the State of Texas. See Minutes of the House Committee on Judiciary, March 19, 1981, pp. 2, 4 (statement of Emerson Jackson, International President of the NAC of North America). NAC members and Rastafarians are not similarly situated.

Second, Rastafarians and NAC members are not similarly situated because peyote is not abused at the same rate as marijuana; thus, the attendant social ills regarding marijuana are exponentially higher than that of peyote. In the *Olsen* case, which was authored

by then Judge Ruth Bader Ginsburg, the D. C. Circuit Court of Appeals noted statistics provided by the DEA quantifying the differences between marijuana and peyote abuse:

" '[T]he actual abuse and availability of marijuana in the United States is many times more pervasive . . . than that of peyote. . . . The amount of peyote seized and analyzed by the DEA between 1980 and 1987 was 19.4 pounds. The amount of marijuana seized and analyzed by the DEA between 1980 and 1987 was 15,302,468.7 pounds. This overwhelming difference explains why an accommodation can be made for a religious organization which uses peyote in circumscribed ceremonies, and not for a religion which espouses continual use of marijuana.' [Citation omitted.]" 878 F.2d at 1463.

While these statistics are somewhat dated, they do support the fact that marijuana abuse is a far greater social and economic problem than peyote. Indeed, even if marijuana use were permitted under a tightly controlled religious use exception, the DEA statistics provide ample evidence that such a system would prove prohibitively difficult to administer, especially if the religious exception attempted to accommodate the Rastafarians' unlimited use beliefs. Again, NAC members are not similarly situated to Rastafarians for purpose of an Equal Protection-Establishment Clause analysis.

Third, and perhaps most importantly, the two groups are not similarly situated because K.S.A. 65-4116(c)(8) grants a peyote exemption to NAC members in order to bring Kansas law in harmony with those statutes in the United States Code enacted under the trust responsibility. Federal Native American law is different. Since the early 19th century, the United States Supreme Court precedent has treated Native Americans as occupying a unique, yet dependent, sphere in our federal system. Modern courts have interpreted the unique obligations owed to Native Americans as exempting laws passed pursuant to the trust responsibility from the strictures of traditional equal protection analysis. See *Mancari*, 417 U.S. at 555; *Warner*, 595 F. Supp. at 600-01. This same power can be and has been exercised by states when they act to accord their law with federal Native American law. See *Livingston*, 601 F.2d at 1115-16; *Reynolds*, 564 F. Supp. at 1412; *Peck*, 143 Wis. 2d at 637. No court in United States history has acknowledged a similar political status on behalf of the Rastafarians. As such, the two groups

are not similarly situated, and the McBrides' Equal Protection-Establishment Clause argument must fail.

The convictions of Joe and Connie McBride for violating K.S.A. 1996 Supp. 65-4163(a)(3) and K.S.A. 79-5201 *et seq*. are affirmed.